UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD S. ALLEN,<br><br>    Plaintiff,<br><br>v.<br><br>TAKEDA PHARMACEUTICALS<br>U.S.A., INC., LARRY BORSKA, and JASON<br>BARANSKI,<br><br>    Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action Nos. 20-11452-LTS
20-11509-LTS
20-11432-LTS

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR EMERGENCY MOTION FOR A PROTECTIVE ORDER

Defendants Takeda Pharmaceuticals U.S.A., Inc. ("Takeda"), Larry Borska, and Jason Baranski (collectively, "Defendants") respectfully request that the Court exercise its inherent authority to enter a protective order prohibiting Plaintiff Ronald S. Allen ("Plaintiff") from (i) directly contacting any Takeda director, officer, or employee, and (ii) disclosing Takeda confidential, proprietary, and/or privileged information.

Within a 3-week period after filing this action, Plaintiff sent threatening and harassing LinkedIn messages to at least 10 different Takeda employees, including Takeda's US President and its Chief Human Resources Officer. Declaration of Lyndsey M. Kruzer ("Kruzer Decl.") Exs. A–J; Affidavit of Chris Allen, Esq. ("Allen Aff.") ¶ 10. Plaintiffs' LinkedIn messages are a continuation of a persistent pattern of behavior dating back to late May 2020, immediately following Plaintiff's termination. *See infra* at 3. Plaintiff has made no secret about his objective—to threaten and cajole Takeda employees until the company accedes to his demands for a substantial monetary payment. *See infra* at 2–13. Those demands, which bear no relationship to his underlying claims in this action, have ranged from tens of millions of dollars

to hundreds of billions of dollars.  *Id.*  In an attempt to apply pressure to Takeda, Plaintiff has

threatened:  (1) to release racially charged, false, and inflammatory statements to the press in

order to injure Takeda's reputation; (2) to incite union organization efforts at Takeda's

manufacturing facilities; (3) to make allegations to the Massachusetts Attorney General about

conduct that is neither substantiated nor in anyway related to the subject matter of his lawsuit; (4)

to contact politicians and regulators with whom he claims to have a personal relationship to

prompt them to investigate Takeda about unspecified subjects; (5) to contact and collaborate

with plaintiffs' attorneys to bring class action litigation against Takeda, again about matters

entirely unrelated to this lawsuit; and (6) most recently, to disclose a confidential list of Takeda's

employees to a union organizer and a class action attorney every day until his demands are met.

*Id.*

Moreover, though the tenor and tone of Plaintiff's messages vary in severity, the

messages are beyond mere nuisance or annoyance.  Indeed, one Takeda employee was

sufficiently concerned about the message she received from Plaintiff that she contacted local law

enforcement, and additional communications from Plaintiff have the potential to influence, deter,

or chill testimony from potential witnesses.  *See infra* at 8, 12, 14.  More fundamentally, while

Takeda remains gravely concerned about Plaintiff's mental well-being in light of his behavior

since his termination, his conduct is unacceptable.  He has availed himself of this court to pursue

his various causes of action against Takeda.  There is no reason whatsoever for any extrajudicial

communications with Takeda employees, much less ones that border on extortion and cause

Takeda's employees legitimate anxiety about their own well-being.  Further, Plaintiff's

intentional disclosure of confidential Takeda information to unauthorized third parties for the

stated purpose of harming Takeda and inducing Defendants to pay his exorbitant settlement demands is a flagrant violation of his legal, contractual, and ethical obligations to Takeda.

## I.      CONCISE BACKGROUND

As detailed in several prior filings, Takeda formerly employed Plaintiff as an in-house employment attorney before he was separated on May 22, 2020 following multiple complaints from internal stakeholders about his behavior and Takeda's view that Plaintiff had been insubordinate and acted unethically in connection with the launch of his business venture during his employment with Takeda.  *See, e.g.*, ECF Nos. 22, 24, 25; Allen Aff. ¶ 2.  Following his termination, Plaintiff's conduct became even more erratic.  Allen Aff. ¶ 3.  In addition to the actions described in Defendants' prior filings, Plaintiff began to send threatening and harassing communications to Takeda employees, including those outside Takeda's legal department or who otherwise had no involvement (or even awareness) of his separation from Takeda.  *Id.*  A clear and consistent pattern of behavior soon emerged:  Concurrent with his communications, Plaintiff made demands to Takeda's in-house and external counsel for large sums of money from Takeda, and, when those demands were not met, Plaintiff amplified his threats to Takeda's employees or the organization itself.  That pattern has continued unabated up until the date of this filing.  *Id.*

For example, and without limitation, in late May 2020 after Takeda's in-house Legal Department advised Plaintiff he would not be paid a severance, Plaintiff made a new demand for $51.3 million.  Kruzer Decl. Ex. K.  In the same communication, Plaintiff stated:  "I have a pretty wide network of attorney[s], including plaintiff attorneys.  So this is not going to be pleasant. . . . But please note, I do have [a] strong feeling of retribution toward Larry [Borska, Plaintiff's supervisor at Takeda] and, growingly towards Jason [Baranski, Borska's supervisor

and Takeda's US General Counsel].  Please convey this demand to them and ask them, what is their job and livelihood worth.  That is not a threat but a promise." *Id.*

In late June, negotiations were ongoing between Chris Allen, Vice President, Head Counsel of US Litigation & Investigations at Takeda ("Mr. Allen") and Plaintiff's counsel about a separation payment.  Allen Aff. ¶ 4.  Plaintiff apparently became dissatisfied about the progression of those discussions.  *Id.*  On June 25, Plaintiff's counsel emailed a draft complaint to Mr. Allen, Sonali Das, an in-house Takeda employment attorney, and Paula Leca, a senior in-house Takeda attorney responsible for supporting several Takeda organizations, including its Oncology Business Unit as well as it Research & Development function.[1]  Plaintiff stated:

> I have instructed Ben [Plaintiff's counsel] to contact the media this evening (local, ABC and CNN).  I think we all know that Japan [where Takeda's global headquarters are located] will not look favorably on this complaint.  I also instructed Ben to serve the complaint on Ramona [Takeda's US President] tomorrow.
>
> My suggestion is that we get on a webex this evening (with Ben) before tomorrow and come to a resolution so that you can report back to Japan and Ramona that it has been resolved.
>
> Let us know what you want to do.

Kruzer Decl. Ex. AA.  Plaintiff subsequently forwarded the email to Takeda's US President ("Ms. Sequeira") about an hour later.  *Id.* Ex. MM.

The following day, Mr. Allen forwarded Plaintiff's email to Plaintiff's counsel.  *Id.* Ex. AA.  Mr. Allen had previously spoken with Plaintiff's counsel on more than one occasion about the fact that Plaintiff's direct communications with Takeda employees were not productive.  Allen Aff. ¶ 5.  In those prior discussions, Plaintiff's counsel concurred, informing Mr. Allen

---

[1] Ms. Das and Ms. Leca had no prior involvement in Plaintiff's termination or his claims against Takeda, nor have they since.  Allen Aff. ¶ 4.

that he had instructed Plaintiff not to do so. *Id.* In fact, Plaintiff's counsel told Mr. Allen that he

advised all of his clients, including Plaintiff, that he would not represent them if they engaged

directly with their current or former employer. *Id.* With those conversations in mind, Mr. Allen

stated in his email, "I am going to assume he is doing this against your counsel. Can you please

ask him again [] to stop?" Kruzer Decl. Ex. AA; Allen Aff. ¶ 5.

Plaintiff did not stop, however. Two days later, on June 27, Plaintiff sent Mr. Allen

another email. Kruzer Decl. Ex. M. The email attached a draft press release entitled "Black

Entrepreneur and Founder of Start-Up AFT-BIO, Suffocated by His Former Employer, Takeda

Pharmaceuticals," which began in its opening paragraph as follows:

> Ronald Allen, black attorney, veteran employment lawyer, former in-house counsel
> for Takeda Pharmaceuticals, and now budding entrepreneur, can hardly believe
> what is happening. His former employer, Takeda, may not be physically kneeling
> on his neck, but it might as well be.[2]

*Id.* Plaintiff stated in the email, "I would propose we meet at the Dunes restaurant" to discuss his

demands. *Id.*

Thereafter, negotiations between Mr. Allen and Plaintiff's counsel about a separation

payment continued until late July, when Plaintiff's counsel withdrew from representing Plaintiff.

*Id.* Ex. BB; Allen Aff. ¶ 5. On July 24, a few days prior to Plaintiff's counsel's withdrawal,

Plaintiff sent an email to Borska entitled "Here I come" in which he stated, among other things,

"I'm bringing everything and there will be nothing but fired bodies left in my wake. A fair

warning." Kruzer Decl. Ex. S. On the evening of July 29, and into the early morning of July 30,

Plaintiff sent a series of 9 emails over the course of a 3-hour period to Mr. Allen, who was then

still in discussions with Plaintiff's counsel about a resolution. *Id.* Exs. NN, OO. In his emails,

---

[2] This email, which came within days of George Floyd's death and the ensuing protests, was clearly meant to be
inflammatory.

Plaintiff made demands ranging from $188 billion to $308 billion, and stated that his demand

would be doubled if Takeda did not pay Plaintiff $1 billion the following day. *Id.* Exs. NN, OO.

On July 30, Plaintiff informed Mr. Allen that his counsel had withdrawn. *Id.* Ex. BB. He also

sent what he styled a "Severance Agreement and General Release," along with his signature

page. *Id.* Ex. CC. The "Severance Agreement and General Release" contained different

financial terms than what Mr. Allen had negotiated with Plaintiff's counsel, and the release did

not address all of the claims that Plaintiff had asserted against Takeda, including his claim for

tortious interference. *See id.*; Allen Aff. ¶ 6. On the same day, Mr. Allen responded by sending

Plaintiff the draft agreement Mr. Allen had negotiated with his counsel and advised him that the

agreement reflected the terms Takeda was prepared to accept. Kruzer Decl. Ex. DD. Plaintiff

responded by email later that day, stating, "Your settlement offer is rejected." *Id.* Ex. EE.

Among other things, he also stated, "I warned you, Jason and Larry that there would be a

reckoning this week and here it begins." *Id.*

On July 31, Plaintiff filed his original complaint with this Court. *See* ECF No. 1. The

next day, after Mr. Allen informed Plaintiff again that Takeda would not sign the "Severance

Agreement and General Release," Plaintiff sent an email to Mr. Allen advising him that "[o]n

Monday, I'm going to file an emergency motion for an expedited hearing," adding "[i]f anything

it paints Takeda in an extremely poor light from the outset, which is the goal." Kruzer Decl. Ex.

FF. After filing the above-referenced motion on August 3, Plaintiff sent Mr. Allen an email on

August 4 attaching a press release which he had submitted to CNN and the local WCVB news

station. *Id.* Ex. O. The press release referenced the Black Lives Matter movement and accused

Mr. Allen, Mr. Baranski, and Mr. Borska of having a racially motivated animus towards

Plaintiff.[3]  *Id.*  In addition, the press release, which Plaintiff also sent to the Court's clerk, Law360, as well as 20 other Takeda employees, included quoted statements attributed to Plaintiff's now former counsel.  *Id.* Exs. P, KK; Allen Aff. ¶ 7.  After Mr. Allen confirmed with Plaintiff's former counsel that he had not authorized the attribution of those statements, Mr. Allen requested that Plaintiff retract the press release.  Kruzer Decl. Ex. R.  Plaintiff refused, stating among other things to Mr. Allen, "Again, I warned you."  *Id.*  In a subsequent message to Mr. Allen later that day, Plaintiff stated, "You know I know both Mo and Stacy Cowan.  We all went to NUSL.  This is not going to go well for you."  *Id.* Ex. GG.  In yet another email to Mr. Allen that day he stated, "Also do [not] make me release the Klan press release [presumably referring to the draft press release he had sent Mr. Allen in June].  I really don't want to mention your name.  I could substitute Christofe [Takeda's CEO – Christophe Weber] if you want.  I'm guessing that won't go well."  *Id.* Ex. Q.  The following day, Allen sent a LinkedIn message to Liz Shultz, a Takeda human resources employee with whom Plaintiff had worked during his employment at Takeda and who had no involvement in Plaintiff's termination.  Allen Aff. ¶ 8.  The message read:  "I'm coming for you (not physically) and it isn't going to be pleasant.  Just an FYI."  Kruzer Decl. Ex. A.

Over the course of the following two weeks, Plaintiff filed additional complaints and motion papers with the Court.  *See* ECF No. 36 at 1–3 (describing procedural history).  He also filed motions requesting mediation with a federal magistrate judge.  *Id.* at 3; *see* 20-11509-LTS, ECF No. 5; 20-11432-FDS, ECF No. 6.  When Takeda did not agree immediately to mediation, Plaintiff sent at least 6 more LinkedIn messages to various Takeda employees.  *See* Kruzer Decl.

---

[3] Despite those accusations, for which Plaintiff offered no support, Plaintiff's original complaint did not assert any allegations about racial discrimination.  *See* ECF No. 1.

Exs. D–G, H–J.  Some were harassing—for example, some messages encouraged Takeda employees to look into this litigation.  *See, e.g.*, *id.* Exs. D–G.  Others were more overtly threatening.  On August 21, for instance, Plaintiff sent a LinkedIn message to Takeda's Chief Human Resources Officer, Padma Thiruvengadam.  *Id.* Ex. H.  After referencing his lawsuit and claimed damages that "could reach $8B," Plaintiff stated:

> [T]he Mass Attorney General who also went to my law school and who I have been friends with for years will be looking into Takeda for independent contractor violations.  Finally, I suspect that in the next few months you will have Union organizing drives at your manufacturing sites.  All of this is happening because the legal department refuses to engage in settlement discussions regarding the wrongful termination of my employment.

*Id.* That same day, Plaintiff also sent a LinkedIn message to Ms. Sequeira, Takeda's US President, stating, "I am writing to give you a courtesy warning that you will likely be subject to a union organizing drive at all of your manufacturing plants.  The ones in California are particularly vulnerable."  *Id.* Ex. I.  Also on that day, Plaintiff sent a LinkedIn message to Sara Ruman, another Takeda human resources employee with whom Plaintiff worked.  It stated:  "I'd start looking for another job[.]  After I'm done with Larry [Borska], Jason [Baranski], and Liz [Shultz], you're next.  A fair warning."  *Id.* Ex. J.

It should also be noted that, separate and apart from their goal of injuring Takeda, Plaintiff's recent LinkedIn messages and other communications to Takeda employees have been no mere nuisance.  Although they did not explicitly threaten physical violence, two of Takeda's employees—Ms. Shultz and Ms. Ruman, both of whom previously worked with Plaintiff—became distressed and concerned for their safety. Allen Aff. ¶ 10.  Ms. Ruman was sufficiently alarmed that she contacted local law enforcement where she resides.[4]  *Id.*

---

[4] In addition to implementing other security measures, given Plaintiff's erratic behavior and threatening messages to Takeda's employees, Takeda was also sufficiently concerned about the welfare of its employees that it has engaged

Through the end of August and into the beginning of September, Plaintiff continued to threaten union action, enforcement actions based on the personal relationship he claimed to have with the Massachusetts Attorney General, and additional press releases.  For example, in an email to Mr. Allen and Takeda's external counsel on August 30, Plaintiff stated:

> Just an FYI, a revised press release will be coming out this week. The union is now actively looking to infiltrate Takeda.  And, I think you will soon have a class action on your hands. . . .  Again, I'm going to ask if you want to pursue a reasonable settlement.  $120k is not going to cut it.  Let me know if you're interested but know that I'm not going away but the activity is going to intensify.

*Id.* Ex. HH.  The following day, August 31, Plaintiff stated in another email to Mr. Allen and Takeda's external counsel, "You both realize that I used to work in the media industry and know GM and news directors around the country.  Japan is not going to be happy with this bad press." *Id.* Ex. II.  Plaintiff also forwarded email communications he had had with an IBEW labor union representative about Takeda's manufacturing facilities and sent another demand for payment— this time, for $102.5 million.  *Id.* Exs. W, JJ.  One of the email communications with the IBEW: (1) indicated that Plaintiff had spoken with an IBEW officer; and (2) sought to arrange a conference call to discuss IBEW's representation of Takeda employees "in Boston and Los Angeles, and possibly elsewhere."  *Id.* Ex. W.  The next day, September 1, Plaintiff again emailed Mr. Allen and Takeda's outside counsel, stating:

> I am willing to stop my efforts in exchange for a good faith gesture from Takeda. I cannot undo what has already been done but I will stop the press releases, union organizing activity and participation in the class action, if the wage claim payment is made by this evening. And then we can continue to negotiate the rest over the next couple of days.  The next move is getting some of my political partners involved and calling Christophe [Takeda's CEO] and Ramona [Takeda's US President].  Also having them speak with the press about Takeda's treatment of employees.  As always, I hope you give this every consideration.

---

its internal corporate security team to conduct two separate threat assessments to evaluate whether Plaintiff posed a safety risk to himself or others.  Allen Aff. ¶ 11.

*Id.* Ex. T.

On September 2, in yet another email to Mr. Allen and Takeda's outside counsel,

Plaintiff stated:

> I still did not hear back from you.  It is hard to take you guys seriously or want to
> engage in settlement talks to bring this to a resolution when you will not respond to
> an email.  I thought I held out an olive branch to resolve this amicably instead of
> the adversarial position that we have been in for months.  Accordingly, I plan to
> continue with my activities which are far more damaging to Takeda than what I
> have asked to resolve this matter.  Again, I think you are making a huge mistake,
> and I believe your shareholders will believe the same.  From day one, you
> underestimated what I was capable of.  I don't think you are going to enjoy the next
> two weeks.  As Larry once said, my initiative was one that people get fired over.  I
> don't know that those of you in the legal department will survive this battle.  I've
> been five steps ahead of you at every turn and I now have unlimited resources
> because I found an investor who has the ability to fund my entire company.  Again,
> as I leave you at the end of every email: "the choice is yours."  So far, you guys
> have chosen poorly.

*Id.*

On September 3, Takeda yet again communicated to Plaintiff through its outside counsel

that it would not agree to pay Plaintiff.  *Id.*  Within hours of receiving that communication,

Plaintiff forwarded an email chain to Mr. Allen and Takeda's outside counsel among Plaintiff,

his prior counsel, and a plaintiffs' class action lawyer in California.  In the email chain, Plaintiff

stated, *inter alia*:

> So.  I think you two [Plaintiff's former counsel and the class action lawyer] should
> get together and discuss the class action over misclassification of independent
> contractors.  The best part of this is that the vast majority of them are in R&D.

> @Ben you should be able to find a lead plaintiff in all of the people you represented
> in R&D.  I would be more involved but I don't want to be involved because of a
> ethical and attorney client issues.

> By the way, buy some Takeda stock.  You won't be disappointed.  It is trading at
> $19/share.  So these efforts should suppress the share a bit.  And you'll make your
> money back. . . .

> So Ben, essentially what has been going on is rather than hire doctors or scientists, Takeda has been keeping them on payroll for sometimes as much as 2 years and well past the 6-month policy.  This is also happening in manufacturing and across all disciplines.
>
> My guess is that there is a putative class on approximately 10,000 over the last six years, which is the SOL.
>
> So when you're looking at vacation and sick time, you're look at 6 weeks of compensation.  Take an average salary $150,000, you're looking at $173M dollar case.  I will of course take a 20% finder's fee.
>
> I may be able to provide 5 or so employees to look to contact as representatives.  I will send them to you when you get home.

*Id.* Ex. U.

On September 4, Plaintiff followed-up with another email stating: "It being Labor Day weekend, the IBEW and I have been think[ing] of ways to announce []its presence to Takeda's employees.  You have the ability to potentially head off some really bad publicity . . . . If this is not resolved by 3pm today (with agreements signed and money wired), I will continue to move forward with the IBEW."  *Id.* Ex. X.

On September 8, Plaintiff forwarded an email to Mr. Allen and counsel for Takeda that he had sent to the IBEW.  The email attached an Excel spreadsheet identifying 887 current Takeda employees for union organizers.  *Id.* Ex. LL.  The employee list that Plaintiff improperly retained is confidential and proprietary information.  Allen Aff. ¶ 9.

On September 9, Plaintiff forwarded an email to Mr. Allen and counsel for Takeda that he had sent to the IBEW.  *Id.* Ex. Y.[5]  The email purported to attach a list identifying 534 current Takeda manufacturing employees for union organizers and stated,

---

[5] Exhibit Y has been submitted in partially redacted form to protect additional Takeda confidential information Plaintiff disclosed in his email.  If the Court requests, Takeda will submit an unredacted version of that exhibit for *in camera* review.

> Steve [of IBEW]: Find the employee list for the employees at the Thousand Oaks
> site outside of Los Angeles.  This plant is a perfect target. . . . Happy hunting.

*Id.*  In his communication to Mr. Allen and Takeda's outside counsel, Plaintiff stated, "I am

going to continue to release a list a day until you choose to come to the table."  *Id.*

Plaintiff has acknowledged that Takeda's employee lists are confidential in response to

an email from Takeda's counsel requesting that he cease and desist from any further disclosures.

Kruzer Decl. Ex. Y.  That email, which encapsulates Plaintiff's intentions over the last three and

a half months to injure Takeda unless his demands are met states as follows:

> I respectfully disagree.  I do not believe that I have broken any legal ethic rules.  I
> do agree that it is confidential information.  But if you want to litigate that issue,
> I'm happy to do it and we will be in litigation for years.   As I said before, I will
> soon have unlimited resources at my disposal.   Although, I think it is a waste of
> our collective times.
>
> I plan on continuing to release the information as you have failed to either show
> good faith or a willingness to resolve this matter.   The next step is to issue public
> releases both about the class action lawsuit and the potential union organization of
> Takeda.  Takeda needs to start thinking about what that will do for its public face
> and, more importantly, share price.  Your shareholders are not going to be happy.
> Again, some of this you will not be able to avoid as the train has already left the
> station.   You need to start thinking whether it is just better to be done with me or
> continue fighting a losing battle.   Unfortunately, Takeda fired the wrong
> employment attorney and should have resolved this months ago when I was simply
> asking for my severance.  Takeda escalated this matter, not me.  I have nothing but
> time and money to devote to blowing up the ship.   Decide whether you want to
> stay on board.
>
> We will wait to hear from you but not really.  I'm close to being done with you all
> together.  I tried to be patient and reasonable.  That ship has sailed.

*Id.*

On September 10, Plaintiff forwarded an email to Mr. Allen and counsel for Takeda that

he had sent to the IBEW attaching another confidential Takeda employee list identifying 946

Takeda employees in Los Angeles and Van Nuys, California.  *Id.* Ex. Z.  In the same email

chain, Plaintiff communicated to an IBEW representative that he may "also want to link up with

Ben Flam and Jim Kawahito here who are working on the misclassification of independent

contractor class action.  There may be someway you t[w]o can coordinate your activities,

especially with the independent contractor[s] that are in the manufacturing space."  *Id.*  Plaintiff

further communicated to Mr. Allen and counsel for Takeda that he was "holding onto" another

confidential list of Takeda employees in Georgia "for a bit of suspense and to keep the lines of

communication ope[n] with the IBEW" and that he was "working on the IBEW press release,"

which should come out "early next week."  *Id.*  Plaintiff also forwarded this email chain to his

wife's email address, which it appears he then used to send the chain directly to Ms. Sequeira

with a new subject line:  "Takeda is going to be unionized."  *Id.*

## II.    ARGUMENT

The Court has inherent authority to restrict litigants from continuing conduct that is made

in bad faith, or that is vexatious, oppressive, or disruptive to the litigation.  *See Chambers v.*

*NASCO, Inc.*, 501 U.S. 32, 43, 45–46 (1991).  Courts routinely draw upon this power to enter

protective orders limiting contact when a party harasses or threatens another party, their

attorneys, their employees, or potential witnesses.  *See Clarke v. Wells Fargo Bank, N.A.*, 2014

U.S. Dist. LEXIS 205578 (D. Or. Nov. 24, 2014) (prohibiting plaintiff from contacting any

person associated with defendant without court authorization where plaintiff persisted in

communicating with defendant and its employees directly after defendant requested that plaintiff

communicate through counsel of record); *Rumbin v. Duncan*, 2012 U.S. Dist. LEXIS 116996 (D.

Conn. Aug. 20, 2012) (prohibiting plaintiff from contacting defense counsel by telephone or

visiting their office where plaintiff "spoke abusively and made threats"); *see also Wang Labs.,*

*Inc. v. CFR Assocs., Inc.*, 125 F.R.D. 10, 12–13 (D. Mass. 1989) (discussing the Court's

authority to "prohibit or remedy abusive or unethical litigation practices"). So embedded is this power that courts often enter such orders as a matter of course without extensive reasoning or citation to authority. *See, e.g.*, *Smith v. Mercer*, 2011 U.S. Dist. LEXIS 174380 (N.D. Ga. Mar. 25, 2011) (prohibiting plaintiff from contacting defendants' attorney at her home); *Cook v. All State Home Mortgage, Inc.*, 2006 U.S. Dist. LEXIS 117774 (D. Ohio June 6, 2006) (prohibiting communication among parties where defendants allegedly made death threats and engaged in other acts of intimidation).

Where, as here, there is a legitimate concern over preventing retaliatory conduct against witnesses (rather than contact that is merely disruptive and vexatious) a protective order should enter whenever the witnesses "reasonably fear retaliation and . . . the court's fact-finding may be materially impaired unless there is provided the tangible protection of a suitable court order." *Ben David v. Travisono*, 495 F.2d 562, 564 (1st Cir. 1974).

For more than three months, Plaintiff's conduct has borne all of the hallmarks of conduct that warrants this Court exercising its discretionary authority. He has repeatedly threatened the employment status of Takeda's employees, *see, e.g.*, Kruzer Decl. Exs. J, K, S, to embarrass them or damage the company's reputation, *see, e.g.*, *id.* Exs. M, O–R, and to impair its financial stability by disclosing the company's confidential information and fomenting unionization efforts and increasing its production costs, *see, e.g.*, *id.* Exs. H, I, T–Y. *See also* Allen Aff. ¶¶ 3, 5, 7, 9, 10–11. In every instance, Plaintiff has done so with a singular purpose—to compel the company to pay him millions, if not billions, of dollars to avoid the intimidation, distraction, and harassment of its employees, damage to its reputation, the disruption of its operations and, most recently, the disclosure of confidential information that Plaintiff obtained while acting as its

counsel. [6]  The sums Plaintiff has sought from Takeda are not settlement demands.  They do not reflect Plaintiff's advocacy about the merits and value of his claim.  Rather, they are a reflection of a sustained course of conduct that approaches, if not meets, the definition of extortion.[7]

Yet, regardless of how Plaintiff's conduct is characterized, there is unquestionably no place for it in this proceeding.  Plaintiff is free, of course, to advocate to this Court—and even to Takeda's outside counsel—for whatever recovery he believes he is entitled to based on the substance of his arguments and views about the evidence and the law.  What he should not be permitted to do, however, is to persuade through coercion—whether it be through racially charged and inflammatory press releases, the intervention of politicians and regulators to investigate Takeda's business practices, the risk of unrelated class-action litigation, union-organizing campaigns, the threatened and/or actual disclosure of confidential information, or any other means.

More so, none of Takeda's employees should be made to be the object of such coercion. That is particularly the case here, where Plaintiff's actions have already engendered fear of retaliation unrelated to this litigation and concern for the personal safety of Takeda's employees who may be witnesses.  As should go without saying, Takeda's witnesses should be entitled to testify fully, truthfully, and without reservation or concerns about being subject to intimidation

---

[6] Plaintiff may not, ethically, disclose information which he learned in confidence while representing Takeda as its in-house counsel, or guide third parties to advance positions adverse to Takeda's interests by utilizing such information.  *See* Mass. R. Prof. C. 1.6, 1.7, 1.9, 1.10.

[7] *See* 18 U.S.C. § 1951 (criminalizing extortion); 18 U.S.C. § 875(d) (criminalizing transmission of interstate communications with intent to extort); *United States v. Avenatti*, 2020 U.S. Dist. LEXIS 3908 (S.D.N.Y. Jan. 6, 2020) (refusing to dismiss criminal extortion action under 18 U.S.C. §§ 1951, 875(d) where attorney threatened to release information about Nike, obtained from the attorney's client and used without the client's permission, to demand payments to himself).

or reprisal.  Anything less, undermines the Court's fact-finding abilities and basic principles of

due process.

## III.    CONCLUSION

For the reasons set forth above, Defendants' Motion should be granted.

Respectfully submitted,

TAKEDA PHARMACEUTICALS
U.S.A., INC.

LARRY BORSKA

JASON BARANSKI

By their attorneys,

*/s/ Paul D. Popeo*
Paul D. Popeo (BBO No. 567727)
Lyndsey M. Kruzer (BBO No. 675797)
CHOATE, HALL & STEWART
Two International Place
Boston, MA  02110
(617) 248-5000
ppopeo@choate.com
lkruzer@choate.com

Dated:  September 11, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that, in accordance with Local Rule 5.2(b), this document was filed through the ECF system on September 11, 2020 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Paul D. Popeo*
Paul D. Popeo (BBO #567727)